1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   RAMON DANIEL VILLALOBOS,                    Case No. 1:19-cv-00442-DAD-EPG

12              Plaintiff,                       FINDINGS AND RECOMMENDATIONS
                                                 REGARDING DEFENDANT'S MOTION
13        v.                                     FOR SUMMARY JUDGMENT

14   ARMENTA TIGGS-BROWN, P.A.,                  (ECF No. 42.)

15              Defendant.                       OBJECTIONS, IF ANY, DUE WITHIN
                                                 TWENTY-ONE (21) DAYS
16

17        I.    INTRODUCTION

18        Plaintiff Ramon Daniel Villalobos ("Plaintiff") is proceeding *in forma pauperis* through

19   counsel in this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff initiated this action by

20   filing a complaint on April 4, 2019. (ECF No. 1.) On December 9, 2019, Plaintiff filed a First

21   Amended Complaint. (ECF No. 32.)

22        This case proceeds on Plaintiff's claims against Defendant Armenta Tiggs-Brown, P.A.

23   ("Defendant"), for (1) deliberate indifference to serious medical needs in violation of the Eighth

24   Amendment; and (2) retaliation in violation of the First Amendment. (ECF No. 36.) Plaintiff's

25   claims arise from allegations that Defendant (1) failed to adequately treat Plaintiff after he broke

26   his wrist; and (2) took Plaintiff off of his pain medications for lower back pain after he filed a

27   grievance against her. (*Id.*) Plaintiff's operative complaint requests an award of compensatory,

28

                                                  1

1   punitive, and nominal damages, plus expenses and interest. (*Id.*)

2       Before the Court is Defendant's motion for summary judgment. (ECF No. 42.) For the

3   following reasons, the Court recommends that Defendant's motion for summary judgment on the

4   deliberate indifference claim be denied and that Plaintiff's request to dismiss his retaliation claim

5   with prejudice be granted.

6       **II.     UNDISPUTED FACTS[1]**

7       The Court has carefully reviewed the parties' submissions, including separate statements

8   of undisputed facts, supporting declarations, deposition testimony, and statements in the parties'

9   briefs.  The following facts are undisputed.[2]

10      On November 27, 2015, Plaintiff broke his left wrist during a football game on the prison

11  yard while incarcerated at the California Substance Abuse Treatment Facility and State Prison,

12  Corcoran ("SATF"). (Undisputed Material Facts "UMF" 11, 13, 14.) Plaintiff was taken to

13  medical at SATF to await an ambulance and was transferred from the prison to Mercy Hospital,

14  where he saw Dr. Steven Shellans. (UMF 15, 17.) Plaintiff believes he received morphine or

15  Dilaudid and also received x-rays of his hand, a half cast on his wrist, and an order for pain

16  medications before being sent back to SATF. (UMF 18.) Plaintiff did not see Defendant on

17  November 27, 2015. (UMF 16.)

18      Plaintiff saw Defendant on December 2, 2015. (UMF 22.)[3] During Defendant's

19  examination of his wrist, Plaintiff was able to move all of the fingers on his left hand. (UMF 29.)

20  Defendant reviewed Plaintiff's medication and saw that he was on Tylenol #3, which was getting

21  ready to expire so she started him on anti-inflammatories. (UMF 32.) Defendant added Tylenol to

22  _____

23      [1] Because Plaintiff does not oppose summary judgment on his retaliation claim, the Court does not address
    facts related to that claim.

24      [2] Both parties have raised evidentiary objections, which the Court has carefully reviewed. To the extent the
    Court necessarily relied on evidence that has been objected to, the Court relied only on evidence it considered to be
25  admissible. It is not the practice of the Court to rule on evidentiary matters individually in the context of summary
    judgment. This is particularly true when "many of the objections are boilerplate recitations of evidentiary principles
    or blanket objections without analysis applied to specific items of evidence." *Capital Records, LLC v. BlueBeat, Inc.*,
26  765 F.Supp.2d 1198, 1200 n.1 (C.D. Cal. 2010) (quoting *Doe v. Starbucks, Inc.*, 2009 WL 5183773, at *1 (C.D. Cal.
    Dec. 18, 2009)). To the extent any objections warrant individual discussion, they are addressed in further detail in the
27  analysis of the merits of the motion.

        [3] Defendant contends that this was Plaintiff's first visit with her, and Plaintiff contends he also saw
28  Defendant twice between November 28 and December 3, 2015. (UMF 22, 24.)

1  Plaintiff's treatment plan for mild to moderate pain. (UMF 34.)

2  Plaintiff submitted a Health Care Services Request Form (CDC 7362) on January 2, 2016,

3  because he had broken his cast on December 31, 2015. (UMF 38.) Plaintiff indicated that he was

4  in a lot of pain and needed to be seen as soon as possible. (UMF 38.) Plaintiff was seen by

5  Registered Nurse Dyksinski on January 4, 2016, who immediately sent him to Dr. Kokor in the

6  Triage and Treatment Area. (UMF 39.)

7  Defendant next saw Plaintiff on January 27, 2016, to follow up on his complaint of wrist

8  pain. (UMF 40.) Defendant started Plaintiff on nonsteroidal anti-inflammatory drugs (NSAIDs)

9  for pain management and ordered repeat x-rays of the wrist. (UMF 42, 43.) The x-rays Defendant

10  ordered were taken on February 2, 2016, and Defendant received the x-ray results/report on

11  February 4, 2016. (UMF 45, 46.) The report noted that the clinical indication for the x-rays was

12  Plaintiff's report of pain from fracture. (UMF 47.) The report further noted findings of ulnar

13  styloid process fracture with mild separation and nonunion, the carpus was intact, intercarpal

14  relationships were maintained, and bone mineralization was normal. (UMF 47.)

15  On February 5, 2016, Defendant put in a request to refer Plaintiff to an orthopedist. (UMF

16  48.) Dr. David Smith, an orthopedist, saw Plaintiff on February 12, 2016. (UMF 53.) Given the

17  fact that Plaintiff had a nonunion of an ulnar styloid fracture and was very symptomatic, the

18  orthopedist recommended open reduction and internal fixation of the fracture. (UMF 54.)

19  Defendant submitted a Health Care Services Physician Request for Services on February 17,

20  2016, for surgery on Plaintiff's wrist, which was approved on February 19, 2016. (UMF 55.)

21  Defendant saw Plaintiff on February 23, 2016, for a follow up of his appointment with the

22  orthopedist. (UMF 56.) Plaintiff had surgery on February 25, 2016. (UMF 57.)

23  **III.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

24  **A.   Defendant's Motion for Summary Judgment**

25  Defendant filed her motion for summary judgment on January 15, 2021. (ECF No. 42.)

26  Defendant argues that she was not deliberately indifferent to Plaintiff's complaints of severe pain

27  associated with his broken wrist. (*Id.* at 17-19.) Defendant contends that she:

28  • Saw Plaintiff for the first time on December 2, 2015, and examined Plaintiff's arm,

3

wrist, and elbow on that date;

- Reviewed Plaintiff's medication on December 2, 2015, and added anti-inflammatories and Tylenol for mild to moderate pain;
- Saw Plaintiff again on January 27, 2016, started him on NSAIDs for pain management, and ordered repeat x-rays; and
- Referred Plaintiff to an orthopedist on February 5, 2016.

(*Id.* at 17-18.) Defendant argues that she did not deliberately ignore Plaintiff's wrist fracture at any time or delay proper treatment. (*Id.* at 19.) Defendant also moved for summary judgment on Plaintiff's First Amendment retaliation claim. (*Id.* at 19-22.)

Plaintiff filed an opposition to the motion on March 18, 2021. (ECF No. 46.) Plaintiff did not present any arguments regarding his retaliation claim, and his opposition stated that Plaintiff agrees to dismiss the retaliation claim with prejudice. (ECF No. 46 at 2.)

As to the deliberate indifference claim, Plaintiff argues that his broken wrist was a serious medical need, and "failure to treat a broken bone is commonly known to result in further significant, and permanent, injury." (*Id.* at 8.) Plaintiff disputes Defendant's version of the facts concerning when Defendant saw him and what occurred during those visits. (*Id.* at 11-13; ECF No. 46-3.) Plaintiff claims that:

- Plaintiff saw Defendant on November 30, 2015, and reported that he could still feel popping and grinding and was in an unusually astonishing amount of pain;
- Defendant told Plaintiff on that date that things will be fine, the hospital took care of him, things will get better, and the pain will subside, and he did not need to see a specialist;
- Plaintiff's wrist was not visible when he saw Defendant on December 2, 2015, and Defendant therefore could not have examined the wrist and determined whether it had swelling or anything abnormal;
- Plaintiff told Defendant he was in severe pain when he saw Defendant on December 2, 2015; and
- Defendant was ordered or directed to send Plaintiff for x-rays and to refer him to

1    an orthopedist after Plaintiff filed a grievance against her.

2 (ECF No. 46-3.)

3        Plaintiff also contends that he saw Defendant in early January of 2016, reported that his

4 pain was not going away, and asked for an MRI or a referral to someone who could examine his

5 muscles or tendons. (ECF No. 46 at 4.) Defendant dismissed Plaintiff's statements, and said "he

6 need not waste time seeing another doctor, because even the homeless people in LA experience

7 pain." (*Id.* at 4-5.) Plaintiff stormed out in anger but returned later, and Defendant told Plaintiff

8 that "I make the decisions, and there's no need for you to see another doctor." (*Id.* at 5.) When

9 Plaintiff asked for pain medication, Defendant said "Oh, that's what this is about? Pain meds? I

10 see." (*Id.*)

11        Plaintiff also argues that Defendant's delay in referring him to a specialist caused his left

12 arm to heal improperly. (ECF No. 46 at 14.) Plaintiff contends that his wrist is permanently

13 disfigured, he is unable to pull anything over fifteen to twenty-five pounds with that hand, and he

14 cannot bend his left wrist all the way back or fully rotate it. (*Id.*) In his opposition, Plaintiff cites

15 to Plaintiff's testimony that Dr. Smith, the orthopedist who performed his surgery, told Plaintiff

16 that the delay "caused more instability, weakness, and more damage to his wrist." (*Id.*)

17        Defendant filed a reply in support of the motion for summary judgment on March 25,

18 2021. (ECF No. 48.) According to Defendant, Plaintiff's deliberate indifference arguments are

19 conclusory, his version of events is not supported by the medical record, and he has not raised a

20 genuine, material dispute of fact. (*Id.* at 2-6.) As to Plaintiff's damages, Plaintiff does not have

21 medical expertise and has not proffered any medical opinion. (*Id.* at 5-6.) Additionally, when

22 Plaintiff was asked at his deposition if any medical provider told him that the limitations in his

23 wrist were due to the delay in surgery rather than the break itself, Plaintiff responded "I haven't

24 asked."[4] (*Id.* at 6.)

25 ///

26        The Court held a hearing on the motion on April 1, 2021. (ECF No. 49.) Counsel

27

---

28        [4] Defendant did not submit copies of the portions of Plaintiff's deposition that allegedly contain this statement.

5

1   Benjamin Rudin appeared telephonically on behalf of Plaintiff and counsel Vickie Whitney

2   appeared telephonically on behalf of Defendant. (*Id.*)

3          **B.      Supplemental Briefing**

4          On April 15, 2021, the Court entered findings and recommendations regarding

5   Defendant's motion for summary judgment. (ECF No. 50.) The Court recommended that

6   Defendant's motion be granted as to Plaintiff's Eighth Amendment deliberate indifference claim

7   and that Plaintiff's request to dismiss his First Amendment retaliation claim be granted. (*Id.* at

8   12.) As to the deliberate indifference claim, the Court found that Plaintiff had failed to present

9   competent evidence from which a reasonable jury could find that the delay in referring Plaintiff to

10  an orthopedic specialist caused his alleged wrist injuries. (*Id.* at 8-11.)

11         On May 6, 2021, Plaintiff filed objections to the Court's findings and recommendations,

12  along with a request for judicial notice. (ECF No. 51.) In his objections, Plaintiff argued, in

13  relevant part, that expert discovery is still open and summary judgment is therefore premature.

14  (*Id.* at 4-11.) On May 13, 2020, Defendant filed a response to Plaintiff's objections.[5] (ECF No.

15  53.) District Judge Drozd entered an order on June 4, 2021, directing Plaintiff to supplement his

16  opposition to Defendant's motion for summary judgment with any retained expert testimony, and

17  permitting Defendant an opportunity to file a further reply. (ECF No. 55.)

18         Plaintiff filed his supplemental briefing on July 23, 2021. (ECF No. 56.) In the

19  supplemental briefing, Plaintiff relies on testimony from Dr. Smith during his deposition on July

20  12, 2021, to show that there is a genuine dispute of material fact regarding the causation element

21  of Plaintiff's Eighth Amendment deliberate indifference claim. (*Id.* at 3.) Specifically, Plaintiff

22  contends that Dr. Smith's testimony shows that Plaintiff was in severe pain while his wrist went

23  untreated, Plaintiff experienced range of motion complications and weakness while his wrist was

24  inactive due to pain, and Plaintiff required two additional procedures that would not have been

25  _____

26  [5] Defendant's response requested that the Court stay all further proceedings until after the district judge assigned to the case issued an order adopting or rejecting the Court's findings and recommendations. (ECF No. 53 at 6-7.) On May 14, 2021, the Court entered an order staying all further proceedings pending issuance of an order on the pending

27  findings and recommendations, and further vacating all remaining deadlines, including the deadlines for rebuttal expert disclosure, expert discovery cutoff, the Telephonic Trial Confirmation Hearing, and trial. (ECF No. 54.) On October 21, 2021, District Judge Drozd entered additional orders vacating the Telephonic Trial Confirmation Hearing

28  and trial. (ECF No. 61, 62.)

required if surgery had been conducted within a couple of weeks of the break. (*Id.* at 4-7.)

On August 5, 2021, Defendant filed her response to Plaintiff's supplemental briefing. (ECF No. 58.) Defendant argues that Dr. Smith is not qualified to provide an opinion because he had no information on what treatment Plaintiff received and he had never seen any of Plaintiff's medical records. (*Id.* at 4-6.) Additionally, Plaintiff's assertions of severe pain are contrary to the record and not supported by Dr. Smith's testimony. (*Id.* at 6-7.) Likewise, Dr. Smith's testimony did not link any weakness or decreased range of motion to the delay in surgery, and his testimony regarding any additional procedures was inadmissible. (*Id.* at 7-9.) Dr. Smith also did not opine that Plaintiff should have had surgery earlier. (*Id.* at 9-10.)

On October 15, 2021, District Judge Drozd entered an order declining to adopt the April 15, 2021 findings and recommendations. (ECF No. 60.) Defendants' motion for summary judgment was referred back to the undersigned for issuance of findings and recommendations in light of the parties' supplemental briefing. (*Id.*)

## IV.    LEGAL STANDARDS

### A.    Summary Judgment Generally

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca* ("*Albino II*"), 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party moves for summary judgment on the basis that a material fact lacks any proof, the Court must determine whether a fair-minded jury could reasonably find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322.  Additionally, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn . . . ."; the court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). Additionally, "[t]he evidence of the non-movant is to be believed . . . ." *Anderson*, 477 U.S. at 255.

**B.    Deliberate Indifference to Serious Medical Needs**

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and

(2) that "the defendant's response to the need was deliberately indifferent." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992) (citation and internal quotations marks omitted), *overruled on other grounds by WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (*en banc*)).

Deliberate indifference is established only where the defendant *subjectively* "knows of and disregards an *excessive risk* to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (emphasis added) (citation and internal quotation marks omitted). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096 (citation omitted). Civil recklessness (failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known") is insufficient to establish an Eighth Amendment violation. *Farmer v. Brennan*, 511 U.S. 825, 836-37 & n.5 (1994) (citations omitted).

In order to recover damages against a prison official for deliberate indifference, an inmate must prove that the indifference "was the actual and proximate cause of the deprivation of the inmates' eighth amendment right to be free from cruel and unusual punishment." *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). Delay in medical treatment generally only constitutes deliberate indifference if it causes further harm. *See McGuckin*, 974 F.2d at 1059–61 ("[When] a claim alleges 'mere delay of surgery,' a prisoner can make 'no claim for deliberate medical indifference unless the denial was harmful.'") (quoting *Shapley v. Nevada Board of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir.1985) (per curiam). As the Ninth Circuit has explained:

> "[A] finding that the defendant's activities resulted in 'substantial' harm to the prisoner is not necessary, *see Wood*, 900 F.2d at 1339–40; *see also Hudson*, 503 U.S. at ——, 112 S.Ct. at 998–1000 (rejecting 'significant injury' requirement and noting that the Constitution is violated 'whether or not significant injury is evident'), although a finding that the inmate was seriously harmed by the defendant's action or inaction tends to provide additional *support* to a claim that the defendant was 'deliberately indifferent' to the prisoner's medical needs: the fact that an individual sat idly by as another human being was seriously injured despite the defendant's ability to prevent the injury is a strong indicium of callousness and deliberate indifference to the prisoner's suffering. *See Gamble*, 429 U.S. at 106, 97 S.Ct. at 292 (holding that a defendant's action or inaction could be 'sufficiently harmful to evidence deliberate indifference to serious medical needs'); *Ortiz v. City of Imperial*, 884 F.2d 1312, 1313–14 (9th Cir.1989) (reversing summary judgment in part because inaction of doctors and nurses

1    resulted in inmate's death).

2    *McGuckin,* 974 F.2d at 1060-61 (footnote omitted, emphasis in original).

3    **V.      ANALYSIS**

4    **A.      Eighth Amendment Deliberate Indifference to Serious Medical Needs**

5        1.    <u>Causation</u>

6        Because the Court's April 15, 2021 findings and recommendations recommended granting

7    summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim due to lack of

8    evidence of causation, the Court first examines this element.

9        Plaintiff initially argued that Defendant's delay in referring him to a specialist for surgery

10   caused Plaintiff lasting damage, including an inability to pull anything above 25 lbs., or

11   sometimes as low as 15 lbs., to bend his left wrist all the way back, or to fully rotate it. (ECF Nos.

12   46 at 6.) In support of this argument, Plaintiff relied on his own deposition testimony regarding

13   what his orthopedic surgeon told him. (*Id.*; ECF No. 46-3 at 2-3.) Defendant, in turn, argued that

14   Plaintiff cannot show that the delay in surgery caused Plaintiff's injuries because Plaintiff does

15   not have medical expertise and has not submitted a medical opinion establishing causation. (ECF

16   No. 48 at 5-6.)

17       In his supplemental briefing, Plaintiff concedes that he does not have any evidence of

18   lasting damage, but relies on testimony from Dr. Smith, the orthopedic surgeon who ultimately

19   performed surgery on his wrist, to establish that the delay in surgery caused Plaintiff pain,

20   weakness, and decreased range of motion before the surgery was performed, and required

21   Plaintiff to undergo two additional surgical procedures that he would not have needed if the

22   surgery was performed earlier. (ECF No. 56 at 4.) Defendant argues that summary judgment

23   should be granted because Dr. Smith is not qualified to provide an opinion regarding causation

24   and otherwise does not support Plaintiff's arguments. (*See* ECF No. 58.)

25       Because Defendant moves for summary judgment by pointing to Plaintiff's lack of

26   evidence as to causation on the Eighth Amendment claim, Plaintiff must present evidence from

27   which a jury could conclude, without engaging in speculation, that his wrist injuries resulted from

28   Defendant's delay in referring him to an orthopedic surgeon. *See Soremkin v. Thrifty Payless,*

1  *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *Brown v. Johnson & Johnson*, 2019 WL 2577296, at *6

2  (E.D. Cal. June 24, 2019) (citation omitted). For the following reasons, the Court finds that

3  Plaintiff has presented sufficient evidence from which a reasonable jury could find that

4  Defendant's delay in referring Plaintiff to an orthopedic surgeon caused him to experience pain,

5  weakness, and decreased range of motion prior to the surgery and necessitated two operations that

6  otherwise would not have been required.

7       *Dr. Smith's Testimony Generally*

8       Defendant first argues that "Plaintiff cannot establish a causal link between the medical

9  care of PA Tiggs-Brown and his claimed damages" because Dr. Smith had no opinion on why the

10  fracture did not heal, had never reviewed Plaintiff's medical records, and did not know what

11  treatment Plaintiff previously received. (ECF No. 58 at 4-5.) Defendant also notes that Dr. Smith

12  did not opine that Plaintiff should have had surgery earlier (*Id.* at 9-10.)

13       These arguments misconstrue the purpose for which Plaintiff relies on Dr. Smith's

14  testimony. Dr. Smith's testimony concerns the effect of the delay, not who was responsible for

15  the delay. Defendant does not dispute that she had the authority to, and ultimately did, refer

16  Plaintiff to an orthopedist, and that the referral was made more than two months after Plaintiff

17  broke his wrist. (UMF Nos. 49, 50, ECF No. 42 at 29 ("49. PA Tiggs-Brown was not directed by

18  any physician or superior to refer Villalobos to an orthopedist. . . . 50. The decision to refer

19  Villalobos to an orthopedist was that of PA Tiggs-Brown, based upon the X-rays and Villalobos'

20  complaint of pain."); *see also* UMF Nos. 13, 48 (noting that Plaintiff broke his wrist on

21  November 27, 2015, and Defendant referred Plaintiff to an orthopedist on February 5, 2016).)

22       Defendant's argument regarding Dr. Smith's lack of knowledge of Plaintiff's medical

23  records and prior treatment is also unpersuasive. Through Dr. Smith's treatment of Plaintiff, Dr.

24  Smith would have learned the basic facts regarding when Plaintiff had been injured and the fact

25  that Plaintiff did not already have surgery.  Additionally, Dr. Smith is an orthopedic surgeon with

26  over 40 years of experience who performed surgery on Plaintiff's broken wrist.  (ECF No. 56-2 at

27  2-4.) Dr. Smith is sufficiently qualified to respond to Plaintiff's counsel's questions based on his

28  own professional experience and treatment of Plaintiff.

1    Defendant also argues at various points that Dr. Smith did not substantiate the claims

2    Plaintiff made in support of his opposition to the motion or provide evidence of lasting damages.

3    (ECF No. 48 at 4-6.) However, Plaintiff's supplemental briefing concedes that there is no dispute

4    of material fact regarding whether the delay caused lasting damages. (ECF No. 56 at 6.) Plaintiff

5    solely relies on Dr. Smith's testimony only to show that there is a dispute of material fact

6    regarding whether the delay in surgery caused some damages, *i.e.* pain, weakness, and decreased

7    range of motion during the period of the delay, and also necessitated two procedures that

8    otherwise would not have been required. (*See* ECF No. 56.) Plaintiff is not required to establish

9    that Defendant's conduct caused substantial or permanent harm for purposes of his Eighth

10   Amendment medical deliberate indifference claim. *See McGuckin,* 974 F.2d at 1060 ("[A] finding

11   that the defendant's activities resulted in 'substantial' harm to the prisoner is not necessary[.]")

12   (citation omitted); *Sharpe v. Cryer*, 2021 WL 3911306, at *13 (E.D. Cal. Sept. 1, 2021), *report*

13   *and recommendation adopted,* 2021 WL 5177451 (E.D. Cal. Nov. 8, 2021) ("[A]t this stage of

14   the proceedings, even without evidence that Plaintiff's [condition] worsened, it is sufficient that

15   Plaintiff suffered 'an unnecessary continuation of his condition' to raise a genuine issue of

16   material fact on this issue.") (quoting *McGuckin,* 974 F.2d at 1062).[6]

17        *Pain, Weakness, and Loss of Range of Motion*

18        Plaintiff's supplemental brief contends that there is a material dispute of fact as to whether

19   Defendant's delay in referring Plaintiff to an orthopedic surgeon caused Plaintiff to experience

20   pain, weakness, and loss of range of motion prior to the surgery. (ECF No. 56 at 25-6.) Plaintiff

21   cites to the following portions of Dr. Smith's deposition testimony to establish that Plaintiff

22   experienced pain during the period of the delay:

---

23   [6] Defendant also argues that reliance on Dr. Smith's testimony is improper because District Judge Drozd directed
     Plaintiff to supplement his opposition to the motion with retained expert testimony, and Dr. Smith is an unretained

24   expert. (ECF No. 58 at 2.) However, the principal distinction between retained and unretained experts is the written
     report requirement, the purpose of which "is to permit a reasonable opportunity to prepare for effective cross

25   examination and . . . arrange for expert testimony from other witnesses." *Ellis v. Pennsylvania Higher Educ.*
     *Assistance Agency,* 2008 WL 5458097, at *7 (C.D. Cal. Oct. 3, 2008) (citations omitted). "Unretained experts tend to

26   form opinions from pre-litigation observation and therefore have files for an attorney to use for cross-examination"
     while retained experts "ha[ve] no such files and [are] thus required to provide the report to enable effective

27   examination." *Id.* (citations omitted). Defendant was present for and participated in Dr. Smith's deposition.
     Defendant does not argue that she was precluded from effectively cross-examining Dr. Smith and does not explain

28   how she is prejudiced by Plaintiff's reliance on unretained as opposed to retained expert testimony.

Q       Okay. So I'll keep going. You also say that he's very symptomatic. How do you determine that?

A       Well, again, you go by what the patient tells you. If he's having a lot of pain with movement, gripping, you know, forceful activity, that type of thing, then that's symptomatic.

. . .

Q       Okay. So going further. I think it's -- yeah, same page. Under Extremities, you say, "Examination of 10 the left wrist reveals considerable tenderness to palpation over the ulnar aspect of the wrist in the region of the ulnar styloid." What does the tenderness to palpation suggest?

A       Again, that goes along with the fact that there is a nonunion or a fracture there.

Q       Okay. So a little more -- so I know what tenderness is, but what is palpation?

A       That's just touching or pressing on the area.

Q       Okay. I thought so. So you also state a painful range of motion. What does that suggest?

A       Well, again, if you ask him to move his wrist up and down, side to side, he's saying it's very painful. And that's going along with the fact that there is a fracture there. It hasn't healed.

. . .

Q       So you also state, "There is pain particularly with forced radial deviation of the wrist." What is a forced radial deviation?

A       That's basically where you just take the wrist and you twist it toward the thumb side. That's radial deviation. When you twist it in the other direction, that's ulnar deviation. So when you twist it toward the thumb side, he was having pain over where the ulnar styloid was.

…

Q       So does that refresh your memory of a pain scale or score having been used on him?

A       Well, I believe he was in quite a bit of pain, yes.

Q       Okay. Additionally, looking at -- so I see with one of them, it says 8. The other one, it says 9. And the one that says 8 was about 45 minutes after the one that said 9. Is there any reason you can see why it would have changed in those 45 minutes?

A       Well, it looks like they gave hydromorphone. And then later I guess the pain was a little bit less.

Q       Okay. Does hydromorphone act that fast?

A       Oh, yeah.

. . .

Q       Okay. So continuing. I think you hinted at this earlier, but is hydromorphone a painkiller?

A       Yes, it is.

. . .

Q       Okay. Do symptoms get better or worse over time if it's not healing properly?

MS. WHITNEY:        Objection. Incomplete hypothetical, vague, calls for speculation.

13

1  THE WITNESS: Well, typically, I mean, if it's not healing, it will just stay symptomatic. I don't know that I can say that it's going to get worse. But you

2  know, as I said, there will still be pain.

. . .

3

Q      Okay. All right. Now, is the painful range of motion something that gets

4  worse over time if a broken bone is not treated?
MS. WHITNEY:        Objection. Lacks foundation, incomplete hypothetical.

5  THE WITNESS:        Well, I mean, it can get worse over time, sure, or it can kind of get to a stable point where it still hurts, but it may not continue to get worse.

6                                              . . .

7  Q      Okay. And what other damage can a delay cause?
A      Well, there is going to be some scar tissue around the wrist and in the area

8  where the fracture was, so there is more scar tissue. And that can cause pain as well.

9                                              . . .

10  Q      Okay. The expert disclosure indicates that you are expected to testify about the likelihood of a delay in surgery causing Mr. Villalobos lasting pain, weakness,

11  instability and other complications. Are you here to testify about that?
A      Well, if we're referring to prior to the time I saw him, he certainly would

12  have had pain from this fracture.

. . .

13

Q      Okay. And so you're not aware of any pain, weakness, instability or other

14  complications from Mr. Villalobos to his wrist following the surgery?
A      Not at this point.

15  Q      Okay. Do you have the opinion that Mr. Villalobos suffered any complications in his wrist –

16  MR. RUDIN:          Objection. Calls for speculation.
BY MS. WHITNEY:

17  Q      -- caused by not having his surgery immediately after his injury?
MR. RUDIN:          Calls for speculation about his current condition.

18  THE WITNESS:        I guess complications, if you mean pain. He did appear to have ongoing pain in the wrist.

19  BY MS. WHITNEY:
Q      Okay.

20  A      And some functional limitations because of that pain.
Q      And is it your opinion that Mr. Villalobos may have had that pain because

21  he didn't have surgery immediately after his injury?
A      Not because he didn't have surgery immediately. But again, I didn't have all

22  the records, so I don't know exactly what the treatment was.

23                                              . . .

24  Q      Hang on one second. So the date says February 12 is when you examined him. It's under Date of Examination under the name Villalobos, Ramon. He didn't

25  have his surgery for a few more weeks. You also say you'll try to get the surgery scheduled for the next surgery date. Does that mean that the next surgery date

26  wasn't available for another few weeks after you saw him on February 12, 2016?
A      Well, I only go -- I only went up there every two weeks. So that would

27  have been my next surgery date.
Q      Oh, I see. So had you seen him earlier, could you have scheduled the

28  surgery sooner?

14

1    MS. WHITNEY:          Objection. Calls for speculation.
     THE WITNESS:          Well, again, as I said, I don't think there was any urgency
2    about the surgery given the fact that it was already three months and it looked like
     it was going on to a nonunion. So waiting a couple more weeks didn't make much
3    of a difference.
     BY MR. RUDIN:
4    Q       Okay. Well, it wouldn't have made much of a difference as far as the pain
     felt in the meantime?
5    MS. WHITNEY:          Objection. Calls for speculation, lacks foundation.
     THE WITNESS:          Well, I mean, he's going to have some pain, I guess, yes.

6

7    (ECF Nos. 56 at 4, 56-2 at 5-6, 8-9, 11-13, 16-17, 20-21, 24-26.) Plaintiff also cites to Dr.

8    Smith's notes from his February 12, 2016 examination of Plaintiff describing Plaintiff's reports of

9    pain at the time of examination. (ECF No. 56-2 at 32, 38.)

10          As to weakness and loss of range of motion, Plaintiff relies on the following testimony

11   from Dr. Smith's deposition:

12       [Q]     So can a delay in treatment cause more weakness with the wrist?
         MS. WHITNEY:          Objection. Lacks foundation, incomplete hypothetical, calls
13       for speculation.
         THE WITNESS:          Well, it can in the sense that if there is a lot of -- if there is
14       ongoing pain preventing the use of the hand forcefully and that type of thing, it
         will certainly affect, you know, the musculature in the forearm and in the hand,
15       things of that sort if a person is -- if a patient is not using the hand or the forearms
         much because of the pain.
16       BY MR. RUDIN:
         Q       Okay. I mean, but like does it result in more weakness like after treatment
17       compared to if it were treated earlier?
         MS. WHITNEY:          Vague as to treatment.
18       THE WITNESS:          Well, again, as I said, if it's left without treatment and there
         is still pain in there, then that would be -- you know, there would be expected to be
19       some weakness.
         BY MR. RUDIN:
20       Q       I'm trying to get at, like obviously there is more weakness before it gets
         surgery or whatever else is the final treatment. I'm talking about after surgery or
21       the final treatment. Does it matter when the surgery or final treatment was for
         one's prognosis on regaining strength?
22       MS. WHITNEY:          Objection. Incomplete hypothetical, lacks foundation,
         vague, calls for speculation.
23       THE WITNESS:          Well, I think certainly if surgery were going to be done, it's
         always better to do it early than to wait too long, because during that period of
24       time, a patient is not really using that extremity as much. If it can be fixed early
         on, that's the whole idea. That's why we do it in the first place.
25       BY MR. RUDIN:
         Q       Okay. So I understand, so a lot of it has to do with, okay, while treatment is
26       delayed, the wrist or arm is not being used as much and that can make it weaker.
         Am I correct so far?
27       A       Yes.
         Q       Okay. And that weakness can last like past the surgery; is that correct?
28       A       It can.

                                              15

1

Q       Like how reversible is that, the weakness throughout that time?
MS. WHITNEY:       Again, objection. Calls for speculation, incomplete

2

hypothetical. Are you talking about this particular type of fracture?
BY MR. RUDIN:

3

Q       Yes, ulnar styloid fracture.
A       Well, again, any type of fracture, when it's causing pain will cause

4

dysfunction to the extent that person doesn't want to use their hand as much or
their wrist and they're going to have weakness. And then it requires therapy and

5

things of that sort to try to get it built back up.

6

(ECF Nos. 56 at 5, 56-2 at 14-16.) Plaintiff also refers to Dr. Smith's notes and testimony

7

regarding loss of range of motion following the surgery. (ECF Nos. 56 at 5-6.)

8

Defendant argues that Plaintiff's assertions of pain caused by the delay are "false and

9

unsupported" by Dr. Smith's testimony. (ECF No. 58 at 6.) Similarly, Defendant argues that

10

Plaintiff "misrepresents" Dr. Smith's testimony regarding weakness and loss of range of motion.

11

(*Id.* at 7-8.)

12

In support of her contention that Dr. Smith's testimony does not support Plaintiff's

13

assertions of pain, Defendant's argument is limited to whether the evidence presented regarding

14

Plaintiff's pain score is unreliable. (ECF No. 58 at 6.) Likewise, Defendant solely focuses on Dr.

15

Smith's post-surgery notes in arguing that Dr. Smith "did not offer any opinion linking his

16

recommendations to anything other than after the surgery he performed." (*Id.* at 7-8.) However,

17

Dr. Smith's testimony was not so narrow. Dr. Smith repeatedly testified that Plaintiff was still

18

experiencing ongoing pain when Dr. Smith examined Plaintiff more than two months after

19

Plaintiff broke his wrist. Dr. Smith also testified that pain causes weakness prior to surgery and

20

will require therapy to increase range of motion because the hand and wrist are not used

21

frequently during that time. This testimony was separate from and in addition to the testimony

22

regarding Plaintiff's pain score and Dr. Smith's post-surgery notes, and is sufficient to meet

23

Plaintiff's burden at summary judgment.

24

Construing all reasonable inferences in the light most favorable to Plaintiff as the non-

25

moving party, the Court finds that Plaintiff has submitted sufficient evidence from which a

26

reasonable jury could conclude that Plaintiff's pain, weakness, and loss of range of motion prior

27

to surgery were caused by Defendant's delay in referring Plaintiff to an orthopedic surgeon.

28

\\\

1    *Additional Procedures*

2         Plaintiff relies on the following portions of Dr. Smith's deposition testimony to show that

3    two of the three procedures performed during Plaintiff's surgery would not have been necessary

4    of the surgery were performed earlier:

5         Q       And would the tenosynovectomy have likely been necessary if you had
          seen Mr. Villalobos sooner?
6         MS. WHITNEY:        Objection. Incomplete hypothetical, calls for speculation.
          THE WITNESS:        If the ulnar styloid had been fixed within -- you know, if it
7         was determined that it needed to be fixed, you know, within a couple of weeks 2 or
          whatever, no, there probably would not have been 3 tenosynovectomy necessary.
8                                           . . .

9         Q       Okay. Would that have likely been necessary if you had seen Mr.
          Villalobos sooner?
10        MS. WHITNEY:        Objection. Incomplete hypothetical, lacks foundation, calls
          for speculation.
11        THE WITNESS: Again, as in my prior answer, if it had been done within a couple
          of weeks, if it was determined that it needed to be done at that point, it probably
12        wouldn't have needed neurolysis, no.

13   (ECF Nos. 56 at 6, 56-2 at 19.)

14        Defendant argues that this testimony should not be considered because her counsel

15   objected to Plaintiff's counsel's questions during Dr. Smith's deposition. (ECF No. 58 at 9.)

16   Specifically, Defendant argues that these questions are incomplete hypotheticals, lacked

17   foundation, and called for speculation because Dr. Smith never saw Plaintiff's medical records,

18   does not know what Plaintiff received, and did not see the x-rays ordered in the emergency room

19   on the date of injury to know what the fracture looked like when acute. (*Id.*)

20        The Court has reviewed the objections to Dr. Smith's testimony and recommends that

21   they be overruled. As discussed above, Dr. Smith is qualified to provide an opinion utilizing his

22   own orthopedic experience and clinical experience with Plaintiff, as well as the basic information

23   regarding Plaintiff's date of injury and the lack of surgery since that injury. Construing the

24   evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendant's

25   delay in referring Plaintiff to an orthopedic surgeon caused Plaintiff to be harmed and sustain

26   damages to a sufficient extent to support a constitutional claim for deliberate indifference to

27   serious medical needs.

28   \\\

1

2.      Deliberate Indifference

2          Having found that Plaintiff has met his burden of avoiding summary judgment on the

3   causation element, the Court turns to the remaining elements of Plaintiff's Eighth Amendment

4   medical deliberate indifference claim.

5          As noted above, deliberate indifference is a two-part test that requires a finding that: 1) the

6   plaintiff had a serious medical need; and 2) the defendant was deliberately indifferent. *Wilhelm v.*

7   *Rotman,* 680 F.3d 1113, 1122 (9th Cir. 2012) (citing *Jett,* 439 F.3d at 1096). Because Defendant

8   does not dispute that Plaintiff's broken wrist was a serious medical need, the only issue is the

9   second part of the test, *i.e.* whether Defendant was deliberately indifferent to that serious medical

10  need.

11         Defendant argues that her conduct did not amount to deliberate indifference because

12  Plaintiff did not need surgery right after the fracture and the need for surgery only arose because

13  the bones did not unite. (ECF No. 42 at 18.) According to Defendant, there is no particular reason

14  why a bone may not unite, and there was nothing that could have been done to prevent the

15  eventual need for surgery. (*Id.*) Additionally, Plaintiff received pain medications from Defendant.

16  (*Id.*) Defendant did not deliberately ignore Plaintiff's wrist fracture or delay proper treatment. (*Id.*

17  at 19.)

18         In his opposition, Plaintiff argues that Defendant was deliberately indifferent because she

19  denied Plaintiff access to an orthopedic surgeon, failed to conduct an adequate examination, and

20  failed to investigate Plaintiff's complaints of severe pain by ordering another x-ray or an MRI

21  until more than two months had passed. (ECF No. 46 at 10-13.) In relevant part, Plaintiff cites to

22  his testimony that Defendant did not examine his wrist on December 2, 2015, and could not have

23  done so because it was covered. (*Id.* at 10.) Plaintiff also submits portions of his responses to

24  Defendant's interrogatories in support of the opposition, which state:

25         **INTERROGATORY NO. 4:**
                 Describe in detail everything that occurred on each occasion when YOU
26      were "thrown out of the infirmary" in January 2016, as alleged in paragraph 19 of
        YOUR First Amended Complaint.
27      **RESPONSE TO INTERROGATORY NO. 4:** Plaintiff told PA Tiggs-Brown
        that his pain was not going away. She said that if anything was wrong with him, it
28      would have been discovered by the previous x-ray. Plaintiff asked to do an MRI,

18

or if he could see someone to examine his muscles or tendons. Plaintiff just wanted to be thorough because his wrist does not feel right. PA Tiggs-Brown said there is no need to waste time seeing another doctor because everybody has pain, even the homeless people in LA. Plaintiff got upset about being compared to the homeless people in LA, yelled "fuck you!" and stormed out. Plaintiff went back in, and told PA Tiggs-Brown that she told him last time that she would talk about another course of action if he is still in the same amount of pain. Plaintiff asks her to just refer him so he does not have to file a grievance against her. She said, "I make the decisions, and there's no need for you to see another doctor." Plaintiff asks what about her telling him that if it doesn't stop hurting, she would try to help. She says there's nothing wrong with him. Plaintiff says there is. They go back and forth. Plaintiff says, "if you're not going to refer me, please give me some pain medication until the grievance is answered." She said, "Oh, that's what this is about? Pain meds? I see." Plaintiff says, "Fuck you, you're crazy." She said, :Get out."

. . .

**INTERROGATORY NO. 6:**
Describe in detail everything that occurred on each occasion when YOU were "thrown out of the infirmary" in February 2016, as alleged in paragraph 19 of YOUR First Amended Complaint.
**RESPONSE TO INTERROGATORY NO. 6:** Plaintiff went back in to see PA Tiggs-Brown, apologizes and asks to start over. He tells her that he has been eating acetaminophen and aspirin by the handful, and his pain is real and just needs to be taken seriously. PA Tiggs-Brown tells him that the pain is normal, it's part of the process. Plaintiff asks her how it's going to hurt if she just puts him in for another x-ray or MRI. PA Tiggs-Brown says, "Oh, we're back to 'this' again." Plaintiff says, "Look, you won't refer me to another 'real' orthopedist, and you won't give me any pain meds. I cannot continue to suffer, it's affecting my ability to have a normal qualify [sic] of life. You are not even an orthopedist, you're making decisions about my bones and pain that are straight up cruel. I'm being honest, please help me." PA Tiggs-Brown said, "That is when PA Tiggs-Brown became angry and told Plaintiff he did not need pain medications and that he was drug seeking. Plaintiff told her he was already receiving pain medication for his back but was having breakthrough pain. If you don't agree with my method of treatment, there are no other doctors, and I have a lot of patients to see, so this visit is over." Plaintiff stormed out.

(ECF No. 46-4.)

Plaintiff's evidence creates a genuine dispute of material fact as to whether Defendant was deliberately indifferent to his serious medical needs. For summary judgment purposes, the Court must draw all reasonable inferences in Plaintiff's favor and must accept his testimony on the disputed point of whether Defendant examined Plaintiff on December 2, 2015. Additionally, in light of the evidence regarding Defendant's comments to Plaintiff, a reasonable jury could find that Defendant delayed in providing Plaintiff care by referring him to an orthopedic surgeon and investigating his complaints of pain for non-medical reasons, such as personal animus, which can constitute deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996),

1  *overruled on other grounds by Peralta v. Dillard,* 744 F.3d 1076 (9th Cir. 2014); *see also Snow v.*

2  *McDaniel,* 681 F.3d 978, 990 (9th Cir. 2012), overruled on other grounds by *Peralta,* 755 F.3d

3  1076 ("[A]ny delay in treatment that was potentially motivated by animus creates a material issue

4  of fact for the jury.").

5        In her supplemental briefing, Defendant also argues that she addressed Plaintiff's pain

6  with appropriate medication when she saw him on December 2, 2015. (ECF No. 58 at 6-7.)

7  However, as noted above, the evidence in the record indicates that Plaintiff was still experiencing

8  pain when Dr. Smith examined him. (*See, e.g.,* ECF No. 56-2 at 32 (noting that physical

9  examination indicated Plaintiff had "considerable tenderness to palpation" and "painful range of

10  motion" in his wrist)). Additionally, Defendant contends that she added Tylenol to Plaintiff's

11  treatment plan for "mild to moderate pain," while Plaintiff contends that he reported "severe"

12  pain. (*See* ECF Nos. 42 at 28, ECF No. 46-3 at 2.) Plaintiff is entitled to all reasonable inferences

13  at the summary judgment stage, including the inference that the treatment Defendant provided

14  was not sufficient to manage Plaintiff's pain.

15        Defendant also argues that she did not see Plaintiff between December 2, 2015, and

16  January 27, 2016, and had no idea whether Plaintiff was in pain during that time. (ECF No. 58 at

17  7.) Defendant cites to Dr. Smith's testimony if Defendant "hasn't seen the patient, then I guess

18  she wouldn't know if he's in pain or not[.]" (*Id.*) Dr. Smith's testimony "guess[ing]" what

19  Defendant did or did not know between December 2, 2015, and January 27, 2016, is insufficient

20  to meet Defendant's burden at summary judgment. Moreover, as described above, Plaintiff

21  disputes that he did not see Defendant during this time period.

22        Additionally, Defendant argues that she cannot be deliberately indifferent because she was

23  not aware that any particular harm resulted from her decision not to refer Plaintiff to an

24  orthopedic surgeon. However, a finding of deliberate indifference requires awareness of a risk of

25  harm, as opposed to awareness that a particular harm in fact ultimately occurred. Indeed, "the

26  officials need not have intended any harm to befall the inmate" to be liable for Eighth

27  Amendment deliberate indifference. *Lemire v. California Dept. of Corrections and*

28  *Rehabilitation,* 726 F.3d 1062, 1074 (9th Cir. 2013) (citing *Farmer,* 511 U.S. at 837).

Having considered the parties' arguments and evidence, and construing all reasonable inferences in the light most favorable to Plaintiff as the nonmoving party, the Court finds that Defendant has failed to meet her burden of establishing that there is no genuine dispute of material fact regarding whether she was deliberately indifferent to Plaintiff's medical needs. The Court therefore recommends that summary judgment be denied as to Plaintiff's Eighth Amendment deliberate indifference claim.

### B.      Retaliation

Plaintiff's opposition to the motion states that he agrees to dismiss his claim for retaliation in violation of the First Amendment with prejudice. (ECF No. 46 at 2.) Defendant's reply indicates that she does not oppose this request. (ECF No. 48 at 1.) A district court may not grant a motion for summary judgment simply because the nonmoving party does not file opposing material. *Martinez v. Stanford,* 323 F.3d 1178 (9th Cir. 2003). However, "[w]here a motion for summary judgment has been served and a stipulation of dismissal has not been filed, a plaintiff may request dismissal by court order." *Smith v. Torres,* 2018 WL 6067244, at *1 (E.D. Cal. Nov. 20, 2018) (citing Fed. R. Civ. P. 41(a)). The Court may issue the dismissal order on terms it considers proper. *Id.* (citing Fed. R. Civ. P. 41(a)(2)). In light of Plaintiff's statement that he wishes to dismiss his retaliation claim with prejudice, and Defendant's lack of opposition to this request, the Court will recommend that this claim be dismissed.

### VI.     CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that:

1.      Defendant's motion for summary judgment (ECF No. 42) be denied as to Plaintiff's claim for deliberate indifference in violation of the Eighth Amendment; and

2.      Plaintiff's request to dismiss his claims against Defendant for retaliation in violation of the First Amendment with prejudice be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within twenty-one (21) days after being served with these findings and recommendations, any party may file written objections with the court. Such a document should be captioned "Objections to Magistrate Judge's

Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __**December 17, 2021**__          /s/ _Erica P. Grosjean_
                                        UNITED STATES MAGISTRATE JUDGE